(17 Misc. Rep. 510.)

## In re GLEASON'S ESTATE.

(Surrogate's Court, Onondaga County. July, 1896.)

1. EXECUTOR—REVOCATION OF LETTERS TESTAMENTARY—MISCONDUCT.
It is "misconduct" rendering the executor "unfit" for the execution of his office, for which his letters may be revoked (Code Civ. Proc. § 2685, subd. 2), where he claims the benefits of a contract between himself and testator, as to which there was strong evidence that testator was of unsound mind at the time of its execution, and by which the executor secured great pecuniary advantage, to the detriment of the estate.

2. REVOCATION OF LETTERS TESTAMENTARY—INCOMPETENCY—DISQUALIFICATION.
Such conduct, however, does not render him "incompetent" or "disqualified," within subdivision 1, to act as executor.

Petition by William Gleason to revoke letters testamentary issued to Henry Lacy as executor of the will of Lucius Gleason, deceased. Granted.

Hiscock & Doheny, for petitioner.
Edwin S. Jenney and Louis Marshall, for respondent.

GLASS, S. The will of the decedent, executed on the 20th day of December, 1892, made no disposition of his estate, but simply appointed Henry Lacy, his nephew, as executor, and gave to him the power to sell, mortgage, and lease the real estate. Mr. Lacy is not one of the next of kin or heirs at law. Upon the probate of the will, letters testamentary were issued out of this court to the executor named. The petitioner in this proceeding is a brother and one of the next of kin of the decedent, and prays for a decree revoking the letters testamentary upon allegations of facts which he contends establish cause for such removal upon grounds recited in section 2685 of the Code of Civil Procedure as cases in which a surrogate's court may revoke letters testamentary and of administration. It is claimed by the petitioner that the proofs show, under subdivision 1 of section 2685, that the executor is incompetent and disqualified by law to act as such; under subdivision 2, that by reason of misconduct in the execution of his office, and dishonesty, he is unfit for the due execution of his office; and under subdivision 5, that his circumstances are such that they do not afford adequate security to the creditors or persons interested for the due administration of the estate. The proofs which it is claimed support the allegations of incompetency, disqualification, misconduct, and dishonesty relate chiefly to the alleged fraudulent claim on the part of the executor that he is the owner, individually, of a large block of the shares of the capital stock of the Third National Bank of Syracuse, which it is urged really belong to the estate; to the alleged fraudulent acts of the executor in

procuring the surrender and cancellation by the testator, shortly before his death, of the executor's individual notes then held by the testator, representing the value of said stock, in procuring the execution by the testator at the same time of a contract providing for such surrender and cancellation, confirming the executor's individual ownership of the stock in question, and accepting in place of the notes in question a new note made by Mr. Lacy for the value of such stock, payable without interest 10 years thereafter, with the privilege of payment at any time with a discount of interest for the unexpired portion of said 10-year period, and in now claiming and insisting upon, individually, all the benefits of such alleged fraudulent surrender and cancellation of notes, and of such fraudulent contract.

It is contended by the petitioner, on the one hand, that the evidence brought forth in this proceeding shows that 1,697 shares of capital stock in the Third National Bank in fact belonged to the testator at the time of his death, and that Mr. Lacy's apparent ownership was not real, but colorable merely; that there was a secret understanding between him and the decedent that he was holding them for the benefit of the testator, as a means of avoiding taxation, by having them stand on the bank books in Mr. Lacy's name, and at the same time having Mr. Lacy's note for their value outstanding in Mr. Gleason's hands, or for some other reason sufficient to Mr. Gleason's mind, but that Mr. Gleason never intended that Mr. Lacy should really own the stock.    It is also insisted by the petitioner that, even if the ownership of the stock in Mr. Lacy was real, Mr. Gleason was at the time of the execution of the contract of December 25, 1892, of unsound mind; that he had reached a stage in the progress of his fatal disease where he was no longer able to transact business, and that consequently that contract, and the surrender and cancellation of the old notes, were and are fraudulent and void as against the estate; and that the acts and attitude of the executor in insisting, since he has been executor, upon his claim that he owns the stock in his individual capacity, and that he is entitled to the advantages of the contract and the cancellation of his notes, constitute incompetency, disability, misconduct, and dishonesty, within the meaning of the statute in question.    The respondent executor, on the other hand, contends that his ownership of the bank stock was always, and is now, real, and not merely nominal, and that the stock is his individual property; that the decedent was of sound mind at the time of making the contract in question; that the contract and the accompanying surrender of his notes and the substitution of another were valid transactions; and that consequently he has committed no act as executor which renders him incompetent or disqualified, or on account of which he may be said to have been guilty of any misconduct or dishonesty which renders him unfit for the due execution of his office.

Mr. Gleason died from diabetic coma on the 3d day of January, 1893.    Gangrene in the toes of one of his feet was associated with the diabetes.    He had taken to his bed about a month previously, and at times suffered intense pain in the foot where the gangrene was located.    Although at times improved in condition, it is apparent that he gradually wasted away, until finally he sank into the coma

which overwhelmed him. Just when the disease had so far progressed as to render him mentally incompetent is a point in dispute. I am satisfied it had not reached that stage down to and including the 20th of December, and have so found as a fact in a proceeding for the revocation of the probate of his will which has been carried on contemporaneously with this proceeding. Mr. Gleason had never married, and his surviving next of kin and heirs at law are his brothers and sisters, and the children of a deceased brother and a deceased sister. His start in life was humble, but he had accumulated a large fortune, which may be approximated at about $500,000 in real estate, and, according to the inventory filed in this court by the executor, $330,000 in personal property. It is alleged in the petition, and admitted by the answer, that his debts at the time of his decease amounted to upwards of $500,000. I do not recall that it appears in the proofs how much of this indebtedness, if any, was secured by pledges of personal or mortgages on real property, nor is that question very important. In his will, made on the 20th of December, 1892, he made no distinction between his relatives as sharers of his fortune, but left the laws of descent and distribution to divide his property among his heirs at law and next of kin. Among the personal property left by the testator were 474 shares of stock of the Third National Bank, conceded to belong to the estate. For many years up to 1888, Mr. Gleason had been the president of that bank, and had given much of his time and attention to its management. In the year 1888 he was deprived of that position by a board of directors elected by stockholders hostile to him and his management of the bank. Without question, it was to him not only a total surprise, but a cause of great grief; but, with characteristic tenacity of purpose, he at once set about to regain control of the bank by buying either for himself or his friends enough stock to control, in co-operation with stockholders already friendly, the next election of directors. He was successful, and at the next election, in 1889, he and his friends were reinstated in the control of the bank. He was elected president, and his nephew, Mr. Lacy, cashier. Mr. Gleason had apparently become very bitter in his feelings toward those who had ousted him from his position, as he thought, without doubt, very unjustly, and he took great satisfaction in being able to regain what he had lost; and, without any doubt, he became thoroughly determined that he and his friends should continue in the management of the bank, and that those hostile to him should have no chance to regain its control. Mr. Lacy had by this time become the testator's chief assistant in the management of the bank, and had gained the testator's trust and confidence. He was born and brought up in Liverpool, the testator's place of residence, and, when a young man, had embarked in a mercantile business in Chicago which proved disastrous, and in 1875, at the age of 30, came back to his old home, and, to his great credit, began at the bottom again, as a common laborer, at work furnished by, or through the influence of, his uncle. In 1879 he was taken into the bank as discount clerk, at a salary of $500 a year. In a year his salary was raised to $700 a year, which continued about six months, and was then raised to $800. About 1883 he

was put upon the books at a salary of $1,000. This salary continued until 1889, when his salary was raised to $1,500. He was then made cashier, at a salary of $6,000 per year, the salary being fixed by the president, and on January 1, 1890, Mr. Gleason increased Mr. Lacy's salary to $1,000 a month, and that rate of salary has since continued. Mr. Lacy is a man of comparatively small means. On the 25th day of December, nine days before the testator's death, there were 1,697 shares of the stock of the Third National Bank standing in the name of Henry Lacy. The contract hereinafter referred to recites that it was all sold and delivered by Mr. Gleason to Mr. Lacy, in various amounts, at different times, between December 1, 1883, and the time of the making of the contract. The evidence shows that some portions of the stock were never in Mr. Gleason's name, but were transferred directly to Mr. Lacy by the former holders. It appears from the evidence that a small portion of these 1,697 shares were an issue of new stock, as an increase of stock upon the holding concededly Mr. Gleason's, and the holding standing in Mr. Lacy's name, and that it was made directly to Mr. Lacy. Mr. Lacy testifies somewhat differently from the recitals of the contract as to the dates of his acquiring at least a portion of this stock. He says, from reference to the stock book, that the transfers to him were made as follows: December 1, 1883, 10 shares; February 27, 1884, 250 shares; November 30, 1888, 342 shares; January 3, 1889, 96 shares; January 22, 1889, 25 shares; June 8, 1889, 25 shares; November 4, 1889, 10 shares; December 2, 1889, 5 shares,—and, in addition to this, the increase of stock and Van Buren stock. All this stock Mr. Gleason furnished the money to pay for. As the respondent claims, all Mr. Gleason had to show for the large amount of money representing the purchase price or the value of these 1,697 shares of stock were Mr. Lacy's individual promissory notes, payable without interest, but on demand. Whether these notes were in fact secured by a pledge of the stock, or not, does not satisfactorily appear. On the 25th of December the testator and Mr. Lacy executed the following contract, which had been drawn up by Mr. Marshall, the testator's counsel, on the preceding day:

"Memorandum of an agreement entered into this 24th day of December, 1892, between Lucius Gleason, of Liverpool, N. Y., party of the first part, and Henry Lacy, of Syracuse, N. Y., party of the second part, witnesseth: Whereas, heretofore, on the 1st day of December, 1883, the party of the first part sold and delivered to the party of the second part 10 shares of the capital stock of the Third National Bank of Syracuse, at a price of $133⅓ per share; thereafter, on the 21st day of September, 1889, 748 shares of said stock, at the price of $133⅓ per share; thereafter, on the 1st day of May, 1890, 775 shares of new issue of increased stock of said bank, and certain stock purchased from the estate of Harmon W. Van Buren, at $100 per share; and from time to time 164 shares of said stock in addition at the price of $100 per share; making in all 1,697 shares of said stock. And whereas, it was expressly agreed between the parties hereto at the time of sale and delivery of said stock, as part of the contract, that the party of the second part should have ample time to pay for such stock, so that the purchase price thereof should practically be paid out of the dividends that might be declared thereon, the party of the first part appreciating that said party of the second part could not otherwise afford to pay for such stock the price so fixed therefor. And whereas, it has been the policy of the party of the first part, in the

management of the said Third National Bank, to defer the payment of dividends on its stock, and as a consequence the party of the second part has been unable to make such payments, and it is now deemed desirable by the parties hereto that a specified term for the payment of said stock should be fixed, and that the party of the first part should be secured for the payment thereof. And whereas, the party of the first part, fully appreciating the services of the party of the second part in its behalf, is particularly desirous of making the terms of payment liberal and advantageous to the party of the second part: Now, therefore, in consideration of the premises, and of the payment of the sum of one dollar by each to the other, and of the mutual covenants herein contained, the parties hereto mutually agree as follows: (1) The party of the second part is to execute and deliver forthwith to the party of the first part his promissory note for the sum of $194,966.66, which is to become payable in ten (10) years from the date hereof, without interest. (2) The party of the second part agrees that the party of the first part shall have a lien by way of collateral security upon said 1,697 shares of the capital stock of the Third National Bank, and that he will hold said stock as the agent of the party of the first part to the extent of the lien of the latter upon said stock: provided, however, that in case he shall, at the request of the party of the first part, pledge such stock for the benefit of the latter, the possession of such pledge shall be deemed the possession of the party of the second part under the terms of this agreement; it being understood that in case any stock so pledged for the benefit of the party of the first shall not be returned to the party of the second part, without expense to him for the redemption thereof, the amount paid to redeem such stock, or, in case of the failure or inability of the party of the second part to redeem the same, the sum of $133⅓ for every share not returned, shall be credited upon said note. (3) The party of the second part shall have the right at any time before the maturity of said note to anticipate the payment of the whole or any part of the principal thereof, and shall, upon such payment, be entitled to a discount from such principal at the rate of six per cent. per annum for the unexpired term of said note. In case a part only of said principal is paid, the party of the second part shall be entitled to the possession of such proportion of said stock, freed from all claims thereon as collateral security, as the anticipated payment plus the discount deducted from the principal of said note by reason of such payment bears to the face of said note. (4) This agreement shall inure to the benefit of, and shall be binding upon, the personal representatives and assigns of the respective parties hereto. In witness whereof the parties hereto have hereunto affixed their hands the day above written.

"[Signed]                                       L. Gleason.
                                             "Henry Lacy.

"Witnesses:
    "H. L. Elsner.
    "Louis Marshall."

The contract was drawn by Mr. Marshall, as he testifies, in pursuance of instructions given him by the testator on one or both of two visits made by Mr. Marshall to Mr. Gleason,—one on the occasion of the execution of the will, the 20th, and the other on the 24th of December. On one of those occasions the testator had caused to be produced to Mr. Marshall the notes made by Mr. Lacy, and held by Mr. Gleason, representing the value or purchase price of the 1,697 shares of stock, amounting to $194,000, for the purposes of computation, and for the purpose of preparing the contract. They were not in fact surrendered to Mr. Lacy until the 25th of December, and on that day Mr. Lacy's new note for $194,000, payable 10 years from date, without interest, was delivered to Mr. Gleason in place of the demand notes surrendered. The important feature of the contract is that it makes the new note due 10 years hence, without interest, and with privilege of paying it up at any time with a discount of interest,

so that Mr. Lacy could, and actually has, as he testifies, paid the $194,000 by the payment of the present value of $194,000 payable 10 years hence.    His inventory filed in this court, of which in this proceeding I may take judicial notice, returns the present value of the note as $78,181.64; so that if that computation is correct his uncle, on the 25th day of December, in effect, made a present to him of $122,000. The validity of the contract, and of the surrender of the old notes and the substitution of them by the new one, is assailed upon the ground that Mr. Gleason was, at the time of that transaction, of unsound mind.    Whether or not this court may, in this proceeding, for the purposes of this proceeding, pass upon that question, or upon the question whether Mr. Lacy was the real owner of the 1,697 shares of bank stock at the time of the execution of the contract, there is an evident impropriety in so doing, unless necessary to a proper determination of this proceeding.    I do not deem it necessary to do so. I am satisfied from the evidence that there are serious grounds for believing that Mr. Gleason was on the 25th of December, 1892, the real owner of the 1,697 shares of stock, in the sense that he had some claim or lien upon them as security for the outstanding notes of Mr. Lacy.    The improbability which naturally suggests itself, that any man of Mr. Gleason's experience and strict business habits would furnish the sum of $194,000 to buy stock to be owned by another, and simply take his promissory notes for that amount, without any lien or security upon the stock itself; the fact that, while dividends were paid, they were credited to Mr. Lacy, and by him immediately turned over to Mr. Gleason, without being credited upon the notes; the fact that Mr. Gleason from time to time did in fact pledge large portions of this same stock for loans made for his individual benefit (although precaution was taken in such instances to procure a written concession from Mr. Gleason to Mr. Lacy's ownership, and a guaranty against loss),—these are some of the circumstances and considerations which cast suspicion upon Mr. Lacy's claim to unlimited ownership of the stock.    There are still more serious grounds for believing, from the evidence presented, that when the contract of December 25th was executed Mr. Gleason was of unsound mind, and mentally incompetent to transact any business, and, consequently, that the contract and surrender of notes were null and void as against the testator's estate and the persons interested in the estate.    I am not unmindful of the force of the testimony both of Mr. Marshall, the counsel, and of Dr. Elsner, the physician, of the testator, who were present when the contract was signed by Mr. Gleason, and who attested it as witnesses.    The circumstances attending the execution of the contract, as related by Mr. Marshall and Dr. Elsner, will, without question, go a great way with whatever tribunal shall finally pass upon the worth of the contract, towards establishing its validity.    According to their testimony, however, Mr. Gleason was a very sick man at the time, and there is a noticeable meagerness of detail in their account of things said by Mr. Gleason on the occasion.    The things done by him were fewer still.    According to Mr. Marshall, the only things said by Mr. Gleason were as follows:

"The testator and I exchanged greetings. I asked him how he felt. He said he had been having pain, and he wasn't as well as he would like to feel. He talked about his toe,—his foot. The doctor, I think, asked him how he felt,—whether he had eaten any nourishment. I think he said he hadn't eaten much; didn't have any appetite. I said to Mr. Gleason that I had prepared the contract that he desired me to prepare, and I had shown it to Mr. Lacy; that he was satisfied with the terms of it; and that he had signed it. I asked him whether I should read it. He said, 'Yes; go on and read it;' and I read it to him. I think he asked me to repeat the total amount of the notes, one hundred and ninety-four thousand and some odd dollars, and he says, 'Yes; that is right,' repeating the amount; and he then, after it was all read, said: 'I am ready to sign that. That is all right.' I went into the other room, and got paper and pen and a book. Dr. Elsner then raised him partially in bed, and he signed his name. He wasn't in a very comfortable position. I asked him if he wanted us to witness it, and he said, 'Yes.' I had the note with me, signed by Mr. Lacy. I delivered it to Mr. Gleason. Think he either told me to put it in that pocketbook he had in the other room, or asked me to take care of it for him."

Dr. Elsner narrates the following things said by Mr. Gleason:

"Mr. Marshall read over the contract to Mr. Gleason in my presence, and Mr. Gleason asked Mr. Marshall and myself to witness it. Before I signed it I asked Mr. Gleason whether he understood what it was, and I think either Mr. Marshall or myself read it over to him again, and after the paper was read to him he turned around and said to Mr. Marshall, 'Louis, how much did you say those notes were?' Mr. Marshall then told him the amount of the notes, and Mr. Gleason said then: 'That is right. I will sign the paper.' And he did sign it in our presence, and we witnessed it."

Questioned as to the testator's mental capacity at that time and before, Dr. Elsner testified that he was perfectly clear on all subjects,—an unusually clear man for one of his years,—and, in his opinion, comprehended business matters perfectly. The physician also testified in the case that the heart of the patient commenced to show signs of flagging on the 28th or 29th, and that the coma commenced on the 31st of December. Against the physician's opinion of the mental condition of the decedent at the time of the execution of the contract, and against the inferences of mental capacity to be drawn from the facts related by him and Mr. Marshall, the mute testimony revealed in the signature of Mr. Gleason to the contract weighs heavily. As compared with his ordinary signature,— one of rare symmetry and precision,—the signature to the contract was a mere scrawl, and at once suggests grave suspicions, not only as to the physical, but as to the mental, condition of the one who made it. The testimony in the case which in my opinion particularly points to an enfeebled condition of mind of the decedent on the 25th of December is that of Lewis A. Hawley and Thomas Molloy. Both of them were long-time and somewhat intimate friends of Mr. Gleason. They had together called upon him in his sick room on Sunday, the 18th of December, and had found him in unusually good spirits, and passed some time in social conversation with him, and left him with the promise that they would call again and have another visit with him the next Sunday. They called at the house on the 25th, either in the middle or the early part of the afternoon. They were met at the door by Mr. Lacy himself, and, as they were starting to exchange with him the customary greetings of the day, Mr. Molloy spoke in rather loud voice, and Mr. Lacy

stopped him, held up his hand, and said: "Sh! you mustn't speak so loud. There has been a great change since you were here last.". They were not immediately admitted to the sick room. On Mr. Molloy's expressing a wish to see Mr. Gleason, Mr. Lacy conducted him to the bedside, and Mr. Hawley followed, stopping at and standing in the doorway of the sick room, in full view of Mr. Gleason, and about eight feet from his bed. Mr. Molloy stepped to the bedside, and Mr. Lacy, speaking to Mr. Gleason, said, "Here is Mr. Molloy to see you." Mr. Gleason opened his eyes, and either he took Mr. Molloy's hand, or Mr. Molloy reached down and took Mr. Gleason's hand, which was lying outstretched at his side; and probably, from the evidence, the latter was the case. He was lying on his back, with his eyes closed, when Mr. Molloy entered the room. Mr. Molloy greeted him, but he made no reply, although he opened his. eyes, and, as Mr. Molloy thinks, recognized him, but quickly closed them, and at times during the interview, of four or five minutes' duration, opened and quickly closed his eyes. Mr. Molloy swears. there was no movement of Mr. Gleason's hand when he took hold of it; his hand was limp. Mr. Hawley is very positive that Mr. Gleason did not say a word during the whole interview, unless it was an exclamation when Mr. Molloy first spoke to him. He did not think he comprehended what Mr. Molloy said to him. He did think Mr. Gleason heard it. Mr. Gleason did not recognize Mr. Hawley at all while he was there. After standing at the bedside four or five minutes, trying to console with Mr. Gleason, Mr. Molloy said, "Good-bye," and left in company with Mr. Hawley. Mr. Hawley says that Mr. Gleason was in a stupor, according to his understanding of the term "stupor." He looked badly and haggard, as a sick man usually does. Mr. Molloy says that he looked as though he was in considerable pain,—"a terrible hard pain." Mr. Molloy testifies that he does not recollect of Mr. Gleason's speaking at all while he was there, and that he does not think he did. All this, it will be borne in mind, was only six hours, or such a matter, before the execution of the contract in question.

Upon the testimony above recited, taken in connection with the character of the testator's signature to the contract itself, and all the facts and circumstances proved, I am forced to find, as above stated, that there are grave grounds for believing that the testator on the 25th day of December, 1892, did not have sufficient mental capacity to make any valid contract, and that, consequently, there are serious grounds for believing that the contract of that date, and the surrender of the old notes of Mr. Lacy, which accompanied the making of the contract. were void as against the estate of Mr. Gleason; and I am obliged to find further that Mr. Lacy himself, ever since the letters were issued to him, has been personally cognizant of Mr. Gleason's doubtful mental condition on the 25th of December, and of all the facts and circumstances which make the validity of the contract and surrender of notes a matter of serious doubt. If the transaction between Mr. Gleason and Mr. Lacy on the 25th of December had been between Mr. Gleason and some person other than Mr. Lacy, it would be the duty of Mr. Lacy, as ex-.

ecutor, once being made aware of the facts, to bring action to set aside those transactions, and the court would quickly revoke his letters testamentary if he did not bring the action. The same obligation which would require the executor to bring suit against another to have the contract set aside as fraudulent requires that he should not, in his individual interest, claim and insist upon the benefits of such contract as against the interests of the estate which he represents. I think it was his plain duty, if he wished to enforce the contract in question against this estate, long ago to have renounced his rights to the executorship; and I think that his insistence upon the advantages of the contract, and of the surrender of his old notes, since the date of the issuing of letters testamentary to him, has been a continuing act of misconduct, if not dishonesty, within the meaning of subdivision 2 of section 2685, which renders him unfit for the due execution of his office. His acts of participation at the time in making or procuring the contract to be made, whatever they were, were not misconduct, within the meaning of the statute, for the reason that he was not then executor. Nor does his claiming the benefits of the contract and transactions of December 25th render him "incompetent or disqualified by law to act as executor," within the meaning of subdivision 1 of section 2685. Those terms have a technical meaning, not at all applicable to the facts of this case.

The question is now presented whether the acts of Mr. Lacy, in insisting upon all personal benefit coming from the transactions with Mr. Gleason whose validity I have found to be clouded in doubt, constitute misconduct which renders him unfit for the due execution of his office, so that he may be removed by the surrogate's court. That a court of equity would remove a trustee for such a cause is well settled. In re Cohn, 78 N. Y. 249, was an appeal from an order of the general term of the court of common pleas of the city and county of New York, which affirmed an order of a judge of the court of common pleas, sitting as a court, removing for "misconduct" an assignee for the benefit of creditors under chapter 466 of the Laws of 1877. Under that statute the only causes for removal are "misconduct or incompetency." Earl, J., said in his opinion:

"The sole question, therefore, is whether there was sufficient cause to authorize the removal of the assignee by the judge. He could be removed for misconduct or incompetency. We think a sufficient case was made to authorize his removal on either ground. There are grounds for believing that the judgment obtained against the assignor for the benefit of his wife was, to a large extent, fraudulent; that it was procured upon claims in large part fictitious, for the purpose of absorbing the assignor's estate and keeping it from his just creditors. In procuring this judgment the assignee was the adviser, counsel, and active agent of the wife; and it may be assumed that he knew the facts upon which it was based, and the purposes for which it was obtained. Under his direction an execution was issued upon the judgment five days before the assignment was made, and levied upon property worth about $28,000; and four days after the assignment this large amount of property, with his co-operation, was sold for about $9,000, and the proceeds paid to the assignor's wife. He made no efforts to arrest the sale or the proceeds, and, knowing what he did of the facts, he could not omit such efforts without being guilty of misconduct. * * * We do not mean to determine

that the judgment was absolutely fraudulent, and that it could certainly have been set aside. All we mean to say is that the facts upon which it was based, and the circumstances under which it was obtained, were such that an assignee cognizant of the facts could not stand by and suffer the whole trust estate to be swept away without any efforts to avoid such a calamity. The creditors were entitled to an assignee who could impartially, and without any violation of duty which he owed to others, assail that judgment and the sale made under it. The words 'misconduct' and 'incompetency,' as used in this statute, have no technical meaning. The two were intended to embrace all the reasons for which an assignee ought to be removed. The power of summary removal conferred upon the county judge, sitting as a court, was intended to be as broad as the exigencies of the case might require. This power could not be less than that possessed by a court of equity, and that, upon such facts as exist here, a court of equity would have power to remove a trustee, cannot be doubted. 2 Perry, Trusts, §§ 817, 818."

The challenge of the power and jurisdiction of the surrogate's courts to revoke the letters testamentary or of administration for the cause found to exist in this case raises an interesting question. Surrogates' courts are courts of limited jurisdiction and powers, and have only such as have been conferred by the legislature. Under the Revised Statutes the surrogate could supersede letters testamentary where an executor had become incompetent by law to serve as such, or where his circumstances were so precarious as not to afford adequate security for his due administration of the estate, or where he had removed, or was about to remove, from the state. 2 Rev. St. 72, § 18. And a surrogate might revoke letters of administration issued, if a will was subsequently proved. 2 Rev. St. 78, § 46. Letters might be revoked for failure to make and return inventory, if the summons issued in proceedings to compel inventory could not be served personally, by reason of the executor's or administrator's absconding or concealing himself. 2 Rev. St. 85, § 19. Chapter 460 of the Laws of 1837 provided that letters might be revoked for failure to give new sureties, or by reason of false representations made by an administrator on the application for letters, and whenever it should appear that an administrator or executor had become incompetent by law to act as such, by reason of drunkenness, improvidence, or want of understanding, and in case a woman married after being appointed as executrix or administratrix, or whenever it should appear that the penalty of the bond taken from an executor or administrator was inadequate in amount, and a new bond was not given. Chapter 288 of the Laws of 1846 provided that letters might be revoked for failure or refusal to appear and account. Such were the grounds for which a surrogate might revoke letters in force when the Code of Civil Procedure went into effect. By reference to section 2685, and the sections relating to the giving of new sureties, it will be seen that all causes for revocation of letters existing at the time the Code of Civil Procedure was passed were, with some verbal changes, reenacted in the Code, and that some new ones were added. The substantial addition was the provision for revocation contained in subdivision 2 of section 2685, viz.:

"Where by reason of his having wasted or improperly applied the money or other assets in his hands, or invested money in securities unauthorized by

law * * * or by reason of other misconduct in the execution of his office, or dishonesty * * * he is unfit for the due execution of his office."

It is plain that by this enactment the legislature intended to confer upon surrogates' courts somewhat larger jurisdiction in the matter of revoking letters than the surrogates had previously possessed. Besides making personal dishonesty a new cause for removal, as "drunkenness," "improvidence," and "want of understanding" had theretofore been, and after specifically making acts of "wasting or improperly applying the money or other assets," and "investing money in securities unauthorized by law," new causes for removal, and retaining "improvident management or injury" of the estate's property as a cause for removal, the legislature provided that "unfitness for the due execution of his office by reason of other misconduct in the execution of his office" shall constitute a ground for the revocation of letters. What did the legislature mean by the phrases "unfit for the due execution of his office," and "other misconduct in the execution of his office?" May it not be said with great reason that the legislature intended by that broad and general language to include all causes for the removal of an executor or administrator growing out of his own conduct and attitude towards the estate for which he ought in good conscience to be removed, but which, on account of the technical definitions which the courts had irrevocably attached to the terms "incompetence," "improvidence," "disqualified," and the like, had not, up to that time, been causes for which a surrogate could remove an executor or administrator; in short, to confer upon surrogates' courts, in respect of misconduct and unfitness growing out of it, the same power which courts of equity have to remove any trustee. May it not, with good reason, be said that the legislature intended to make removal possible and proper in any case where the interests of the representative as an individual and as an executor are diametrically opposed and thoroughly hostile upon an important matter affecting the rights of the estate and those interested in it? It is my opinion that the legislature did so intend, and that the term "misconduct," as used in the Code, has precisely the same meaning as the same word "misconduct" in the statute of 1877, governing the removal of assignees. But, whether or not the extensive jurisdiction of a court of equity to remove a trustee of an express trust for misconduct on the part of the trustee was intended by the legislation in question to be given to surrogates' courts in cases of executors and administrators, the supreme court, in our own department, has, as it seems to me, construed the statute in question, and defined the term "misconduct" in a manner which requires of this court the conclusion of law that the acts of Mr. Lacy are misconduct rendering him unfit for the due execution of his office. In re West's Estate, 40 Hun, 291, was an appeal from a decree of the surrogate's court of Oneida county, made upon the report of a referee, revoking the letters of an administratrix. The principal misconduct alleged and proved in that case was that the administratrix made claim that she individually owned certain personal property, which the petitioner claimed belonged to the es-

tate, refused to inventory it, and forbade the appraisal of it. The petition also alleged, in general terms, that the administratrix, by reason of her misconduct and dishonesty in the execution of her office, was disqualified and unfit for the due execution of her office. The burden of the petition and of the proofs, as I gather from the appeal book, was the claim of individual ownership made by the administratrix, and her refusal to inventory the property in dispute. The referee found, as to some of the property, that it belonged to the decedent's estate, and not to the administratrix individually, and found that she was guilty of misconduct warranting her removal: (1) In claiming and receiving certain personal property as administratrix, and subsequently assuming a different and hostile attitude in relation to the ownership of the same property, claiming that it belonged to her individually, and certain other persons; (2) in setting up and claiming title individually to certain other property, which the referee found to belong to the estate, "thereby placing herself in conflict with and in antagonism to the trust estate, which she was in duty bound to protect, and which she represented." The proofs taken in that case did not, as I read them, disclose any other substantial ground for which any court was likely to remove an executor or administrator. At most, it consisted of having shown too much temper, and having used rather harsh language towards the next of kin. In disposing of the appeal from the decree confirming the referee's report, and revoking the letters, Hardin, J., says:

"Notwithstanding the fact that Mrs. Jones, in her own behalf and in behalf of her sisters and brothers, claimed a large portion of the personal property under the will of their father, and that it did not pass to the intestate, and that she was not the owner of it at the time of her death, she might have consented to the inventory of the property, with reasonable and suitable notice that she insisted that it did not belong to the intestate; but, on the contrary, she stubbornly refused to have it inventoried or appraised, and the evidence taken before the surrogate furnishes strong ground for the assertion that she has been guilty of misconduct in the execution of the office of administratrix, and an inspection of the evidence leads naturally to the conclusion that, by 'reason of misconduct in the execution of her office, she has become unfit for the due execution of the office.' * * * Without passing upon the question of whether the claim set up by Mrs. Jones in her own behalf, and that of her brothers and sisters, was valid, or whether the personal property which was the subject of dispute at the time the appraisers assembled was the property of the intestate or not, we are of the opinion that the evidence abundantly supports the decree pronounced by the surrogate revoking letters of administration issued to Mrs. Jones."

If I am right in assuming that the evidence taken before the surrogate, referred to by the learned justice who wrote the opinion as showing misconduct, was in part at least the evidence as to the individual claim to ownership set up by the administratrix, it logically and necessarily follows from this decision that the supreme court thought that the legislature intended, by the use of the terms "misconduct" and "unfit" in the statute in question, to confer upon surrogates' courts the power to remove an executor or administrator in any case where his acts, interests, claims, and attitude as an individual in any matter affecting the estate are so hostile and antagonistic to the interests of the cestuis que trustent that a court

would readily conclude that he ought not to be permitted to represent both himself and the estate. This judgment of the supreme court was affirmed by the court of appeals. 111 N. Y. 687, 19 N. E. 286. The court of appeals has also passed upon the question, as I think, at least incidentally. In the case of Lichtenberg v. Herdtfelder, 103 N. Y. 306, 8 N. E. 526, Earl, J., says:

"The lands, although conveyed by the testator in his lifetime, were assets which could be appropriated for the payment of his debts. Laws 1858, c. 314. If the facts stated in the complaint are true, it is the duty of the executors to pursue the real estate, and reclaim it for the benefit of the persons interested in the estate of the testator, and no one creditor can appropriate it for his sole benefit. * * * That the fraudulent grantee is one of the executors furnishes no insurmountable obstacle. If she should refuse to restore the lands to the estate, she could be removed from her office of executrix, and then the remaining two executors could, under the act of 1858, disaffirm the conveyances of the real estate, and bring action to set them aside."

The learned judge does not say that the surrogate's court could remove her for the cause mentioned, but that is the fair inference, as the case was decided six years after the Code of Civil Procedure went into effect. The case of In re Moulton's Estate (Sup.) 10 N. Y. Supp. 717, has been cited by counsel for the executor as an authority for his contention that the surrogate's court has no power to revoke these letters. In that case the letters had not been revoked, but the petition for revocation was dismissed; and the general term held that the decision of the surrogate was correct, and his discretion wisely exercised. Apparently in answer to the argument of the petitioner's counsel that unless the administrator was removed, and a new one appointed, who could bring this action to set aside the transfer of property made by the decedent in his lifetime, alleged to have been fraudulent as to creditors, the petitioner, claiming to be a creditor as well as one of the next of kin, would be remediless, the court said (Hardin, J.):

"The learned counsel for the appellants, in a very exhaustive argument submitted to us, lays great stress upon the circumstances attending the transfer of a mortgage for $8,650 by Symonds, as assignee, to the plaintiff, and to the fact that she had commenced an action to foreclose that mortgage, and had omitted to place the same upon the inventory filed, and seems to suppose that her removal from the office of administration was essential in order to enable appellants, as heirs at law or as creditors of the deceased, to contest the title of the plaintiff to the mortgage, and to enable them to assert that the mortgage in fact was an asset belonging to the estate of the deceased. He calls our attention to the statute of 1858, c. 314. * * * Surely, upon creditors applying to the administratrix to bring such action, * * * she would be called upon to yield to the request, or to make a refusal. If she refused, then the creditors could bring an action, and make her a defendant in her representative as well as her individual capacity, and allege her refusal to bring the action, and thus the creditors would have the full benefit of the provisions of the statute, to the same extent as though the action had been brought by the administratrix. We are of the opinion that the removal of the respondent from the office of administratrix was not necessary to enable the appellants, as creditors, to maintain proper action to avoid the alleged ownership by the plaintiff of the mortgage, on the ground that it was the property of the deceased, and that the transfer thereof to the plaintiff was fraudulent."

And the learned judge cited numerous authorities. The court did not in the slightest degree recede from the position it had taken in the earlier case of In re West. Without doubt, the peti-

tioner in this proceeding, or any of the next of kin, could bring suit against Mr. Lacy, individually and as executor, to test the title to the 1,697 shares of the bank stock, to cancel the contract of December 25th, or to annul the surrender of the old notes; but, under all the facts and circumstances of this case, should the next of kin of Mr. Gleason be shut up to that remedy? Ought not this court, called upon to protect the interests of all persons interested in the estate, to see to it that an opportunity is afforded to this estate, as an estate, through its legal representative, to bring a test of the important questions in controversy between it and its executor in a court of the largest jurisdiction and most ample remedies? The amount involved alone, if there were no other distinguishing features, takes this case out of the ordinary class of cases, in which, on account of the smallness of the amount involved, a court might reasonably say that it would leave the next of kin to his remedy of himself bringing action, rather than remove the executor. The due administration of this estate, so far as now appears, requires that the test be made, and whatever of labor and expense shall properly attend the making of that test should be borne by the estate. The executor should no longer be allowed to use his position as the representative of the estate and as an officer of this court as a shield to prevent the estate from prosecuting with all the vigor at its command such suit against him as will fairly and finally determine the rights of all parties. The court is satisfied that the petitioner has established that the executor is unfit for the due execution of his office, by reason of misconduct in the execution of his office, within the meaning of the law. The disposition made of this branch of the case makes it unnecessary to consider the allegation that the circumstances of the executor are such that they do not afford adequate security to the creditors or persons interested. I do not think the evidence establishes any of the other causes for revocation enumerated in the statute.

A decree revoking the letters testamentary issued to the executor may be entered on five days' notice. The petitioner should be allowed costs, to be taxed, payable out of the estate. Ordered accordingly.